**Martin John BEATTIE, et al., Plaintiffs,**

**v.**

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 82–3520.**

United States District Court,
District of Columbia.

June 25, 1984.

Juanita M. Madole, Speiser, Krause & Madole, Washington, D.C., for plaintiffs.

Gary W. Allen, U.S. Dept. of Justice, Torts Branch, Civil Div., Washington, D.C., for defendant.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

This case involves an unusual question under the Federal Tort Claims Act—whether the Act applies to torts committed by employees of the United States in Antarctica.

Plaintiffs, appointed by foreign courts as administrators of the estates of individuals killed in the crash of an Air New Zealand DC–10 in Antarctica on November 28, 1979, brought this suit under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, claiming negligence by U.S. Navy personnel on duty at two air traffic control facilities located at the McMurdo Naval Station airfield on that continent.[1] The government has moved to dismiss, asserting that the claims are not cognizable under the Act.

## I

■ Section 2680(k) exempts from the coverage of the Federal Tort Claims Act "any claim arising in a foreign country,"

and the basic question before the Court is whether Antarctica is a "foreign country" within the meaning of the statute. That issue has never before been decided and, for a variety of reasons, it is not free from doubt.

Antarctica is unique on the surface of the earth[2] in that it is not subject to the sovereign rule of any nation; it has never been part of any such sovereignty; and there are no plans to subject it to such rule in the future. The United States itself has taken the position that the continent and surrounding ice shelves are not subject to its own rule or that of any other nation.[3] Indeed, under Article IV of the Antarctica Treaty, signed on December 1, 1959, the contracting nations[4] agreed not to assert any territorial claim in Antarctica or to establish rights of sovereignty there.

In view of this status of Antarctica,[5] if the words of the statute are to be the decisive guide to statutory interpretation, the government's motion must fail, for clearly the instant claim did not arise in a foreign country as that term is commonly understood. Antarctica is not a foreign country; it is not a country at all;[6] and it is not under the domination of any other foreign nation or country. Thus, if it be

---

1. The specific claim is that these air traffic controllers failed to advise the crew of the DC–10 of the hazardous meoterological conditions and the plane's descent into mountainous terrain.

2. Outer space may occupy similar status.

3. When Admiral Byrd initially occupied parts of Antarctica, he claimed its territories for the United States. However, that claim has long been abandoned. The position of the United States government with respect to the future is somewhat equivocal. In 1981, the Assistant Secretary of State, Bureau of Oceans and International Environmental Affairs, James L. Malone, stated:

   ... there is no consensus that Antarctica is beyond the limits of national jurisdiction. The United States views this from two perspectives. First, while the United States does not recognize territorial sovereignty in Antarctica, the U.S. actively participates in the Antarctic Treaty which expressly does not prejudice the claims to territorial sovereignty

made by seven states prior to the Treaty's entry into force. Second, the United States has and maintains a basis to a claim of sovereignty in Antarctica and this basis of claim is protected under the Antarctica Treaty.
   Law of the Sea Negotiations: Hearings before the Subcommittee on Arms Control, Oceans, International Operations & Environment of the Committee on Foreign Relations, 97th Cong., 1st Sess. 24–25 (1981).

4. Argentina, Australia, Belgium, Chile, France, Japan, New Zealand, Norway, South Africa, the Soviet Union, the United Kingdom, and the United States.

5. The unique status of Antarctica has been termed terra nullius, res nullius, and global commons, but each of these appears to suffer from some intrinsic inaccuracy as applied to that continent.

6. Assuming that country is a synonym for a nation; *i.e.*, a body of individuals under a single government.

deduced from the language of the law that the section 2680(k) exception applies only where the government of a foreign nation has or asserts sovereignty, the Court would have to hold that with respect to Antarctica the exception does not, and the Act does, apply.

It is also true, on the other hand, that Antarctica is not part of the United States.[7] The government builds upon that fact to argue that Congress meant, or must have meant, to exclude it from the reach of the Federal Tort Claims Act on the theory that the Act applies only to territory over which the United States exercises jurisdiction and sovereignty.

Unfortunately, there appears to be no legislative history to provide enlightenment. And, as will now be seen, extrinsic aids to construction in the main support application of the Act to torts of American personnel in Antarctica although, again, there are also some grounds for reaching a contrary conclusion.

First. A line of cases exemplified by *United States v. Spelar*, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed.3 (1949) strongly suggest that section 2680(k) should not be construed to bar this suit.[8] *Spelar* was a Federal Tort Claims Act action arising on an American airbase in Newfoundland which had been leased by Great Britain to the United States for ninety-nine years as part of the famous exchange of bases for destroyers in the early days of World War II. The Supreme Court held that the suit was barred by the section 2680(k) exception because (1) sovereignty was vested in another nation, and (2) Congress did not wish to subject the United States government to liability depending upon the law of a foreign power. The Court emphasized collo-

quy during House Judiciary Committee hearings between Assistant Attorney General Shea and Congressman Robinson as follows:

Mr. Shea.... Claims arising in a foreign country have been exempted from this bill, H.R. 6463, whether or not the claimant is an alien. Since liability is to be determined by the law of the situs of the wrongful act or omission it is wise to restrict the bill to claims arising in this country. This seems desirable because the law of the particular State is being applied. Otherwise, it will lead I think to a good deal of difficulty.

Mr. Robinson. You mean that any representative of the United States who committed a tort in England or some other country could not be reached under this?

Mr. Shea. That is right. That would have to come to the Committee on Claims in the Congress.

And the Court went on to state:

In brief, though Congress was ready to lay aside a great portion of the sovereign's ancient and unquestioned immunity from suit, it was unwilling to subject the United States to liabilities depending upon the laws of a foreign power. The legislative will must be respected.

(footnote omitted). 338 U.S. at 221, 70 S.Ct. at 12; see also *Sami v. United States*, 617 F.2d 755, 762–63 (D.C.Cir.1979); *Callas v. United States*, 253 F.2d 838, 839–40 (9th Cir.1958); *Pignataro v. United States*, 172 F.Supp. 151 (E.D.N.Y.1959); *Roberts v. United States*, 498 F.2d 520, 522 n. 2 (9th Cir.1974); *Gerritson v. Vance*, 488 F.Supp. 267, 268 (D.Mass.1980); anno-

---

7. The Supreme Court, unhelpfully from the point of view of the problem here under review, said in 1901 in a different context that a foreign country is that which is "exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States." *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901). The Court may not have considered prior to the expedition of Admiral Byrd to the South Pole in 1928 and the establishment thereafter of quasi-permanent settlements on Antarctica, that inhabited territory could exist which

was neither within the sovereignty of the United States nor within that of a foreign nation.

8. In making this assessment, the Court has considered the familiar rule that, because the FTCA constitutes a waiver of sovereign immunity, it must be strictly construed. *Thomas v. Calavar Corp.*, 679 F.2d 416, 418 (5th Cir.1982); *Builders Corporation of America v. United States*, 320 F.2d 425, 426 (9th Cir.1963).

tation 6 L.Ed.2d 1476.[9] The reasoning of these cases inferentially supports an application of the Act to Antarctica since no nation claims sovereignty on that continent and the law to be applied would not be that of another nation.[10] See Part II *infra.*

On the other hand, one court has held,[11] and another has concurred,[12] that among other possible reasons for the section 2680(k) exception, all of them applicable here, are a reluctance to extend the benefits of the Act to foreign populations,[13] the absence of United States courts at the situs of the tort, and the difficulty of bringing witnesses to a trial in the United States. In short, no clear-cut answer emerges from these materials.

Second. In situations which are somewhat analogous to that created by the Federal Tort Claims Act, United States laws and practices have been applied to Antarctica. Thus, the income tax regulations [14] define "foreign country" as "territory under the sovereignty of a government other than that of the United States." The U.S. Tax Court, after reviewing the history and status of Antarctica, concluded that Antarctica is not a foreign country. *Larry R. Martin v. Commissioner,* 50 T.C. 59 (1968). Similarly, the Tariff Act of 1930,[15] the Interstate Transportation of Wagering Paraphernalia Act,[16] the State Conducted Lotteries Act,[17] the Foreign Bank Participation in Domestic Market Act,[18] and the International Flight Information Manual published by the Federal Aviation Administration [19] pursuant to the Federal Aviation Act,[20] all directly or by necessary implication exclude Antarctica from the "foreign country" category.

Moreover, to the extent that there is any assertion of governmental authority in Antarctica, it appears to be predominantly that of the United States. The United States conducts all search and rescue operations in Antarctica and, significantly, it controls all air transportation.[21] Further, when Admiral Byrd first occupied Antarctica, he established a United States Post Office in the Ross Dependency.[22] That Post Office has since been abandoned but McMurdo base now operates under a United States zip code. United States dollars are the currency of exchange at that base, and all persons on flights that land there must fill in immigration cards. *Id.* at 62.

Third. If the allegations of the complaint are true, personnel employed by the United States government were guilty of negligence, possibly recklessness, and as a consequence an airplane crashed and all passengers and crew were killed. If the government's motion to dismiss is granted,

9. The decisions relied on by the government are to the same effect. *Cobb v. United States,* 191 F.2d 604 (9th Cir.1952) and *Burna v. United States,* 240 F.2d 720 (4th Cir.1957), both involved occupied Okinawa where the United States never asserted sovereignty, and *Meredith v. United States,* 330 F.2d 9 (9th Cir.1964) arose in the American embassy in Bangkok, Thailand. With respect to all three cases, sovereignty was in another power.

10. Cf. *Blumenthal v. United States,* 189 F.Supp. 439, 446 (E.D.Pa.1960).

11. *Burna v. United States,* 240 F.2d 720 (4th Cir.1957).

12. *Meredith v. United States,* 330 F.2d 9, 10–11 (9th Cir.1964).

13. Plaintiffs in this case are residents and citizens of either New Zealand or Great Britain.

14. 26 C.F.R. § 1.911–3(d) (1983); see also Rev. Rul. 67–52, 1967–1 C.B. 186.

15. 19 U.S.C. §§ 1336(h)(3), 1338(i).

16. 18 U.S.C. § 1953(d).

17. 18 U.S.C. § 1307(c).

18. 12 U.S.C. § 3101(8).

19. 49 U.S.C. § 1301 *et seq.*

20. International Flight Information Manual vol. 30, January 1983.

21. For example, when in 1969 a group of New Zealand Alpine Club members desired to explore a range in Victoria Land, an area in Antarctica near the Ross Sea, it was refused permission because American authorities had limited allocation of space on its aircraft for New Zealanders. F.M. Auden, *The Ross Dependency* 74–75 (1972).

22. F.M. Auden, *supra* at 57.

no one will be held liable for that negligence, and the survivors will not be able to claim or receive damages for these actions.[23] While, to be sure, there is not necessarily a remedy for every wrong, the Court is certainly justified in avoiding a construction of the governing statute which would lead to the result of a remediless wrong if that can fairly be done.[24]

The Court concludes that, although the issue is not free from doubt, section 2680(k) does not bar this action.

## II

The government also argues that venue is improperly laid in this Court, and that District of Columbia law may not be applied. Both positions appear to the Court to be unsound.

■ 28 U.S.C. § 1402(b) provides that tort claims may be prosecuted only "in the judicial district ... wherein the act or omission complained of occurred," and, says the government, since the situs of the acts or omissions is Antarctica, venue could not properly be here. This analysis neglects to consider that the complaint also alleges that the Department of Defense failed to use due care in the selection, training, and supervision of the naval personnel at the McMurdo base and to establish reasonable standards of training and performance for the operation of the facilities at the base.[25] A tort claim under the FTCA arises at the place where the negligent acts occurred; the place of the accident or injury is not necessarily controlling. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

As a consequence of that principle, the FTCA has been applied a number of times in situations analogous to that involved here, and suits were allowed to be brought in the District of Columbia pursuant to District of Columbia law although the primary effect of the tort was abroad. See *Sami v. United States, supra; Leaf v. United States*, 588 F.2d 733 (9th Cir.1978); *In re Paris Air Crash of March 3, 1974*, 399 F.Supp. 732 (C.D.Cal.1975); *Roberts v. United States*, 498 F.2d 520 (9th Cir.1974); see also, *Lamont v. Haig*, 590 F.2d 1124 (D.C.Cir.1978).

■ The appropriateness of District of Columbia law and venue are further supported by the fact that the necessary records relating to United States naval operations in Antarctica, and more particularly the records pertaining to this particular crash, are located in the District of Columbia. It may also be noted that the National Transportation Safety Board, headquartered in the District, sent to the site of the crash both its official representative and its flight recorder expert. The Federal Aviation Administration also sent a representative, and it returned the flight data recorder to the District of Columbia for analysis.

In *In re Air Crash Disaster Near Saigon, Vietnam on April 4, 1975*, 476 F.Supp. 521, 527 (D.D.C.1979), Judge Oberdorfer applied District of Columbia law to

---

**23.** Since there is neither foreign sovereignty nor foreign law in Antarctica, the responsibile parties could not be reached under the laws of any other nation. 10 U.S.C. § 2734, to which the government refers, provides only a strictly discretionary settlement procedure.

**24.** The allegedly negligent persons are United States personnel, and it is therefore neither surprising nor shocking that United States law should be applied. See Part II *infra*.

**25.** The government argues that plaintiff cannot rely upon these acts or omissions because the claims based thereon are dismissable under the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). However, the cases cited—*Miller v. United States*, 522 F.2d 386 (6th Cir.1975); *Spillway Marina Inc. v. Unit-*

ed States, 445 F.2d 876 (10th Cir.1971); *Reminga v. United States*, 631 F.2d 449 (6th Cir.1980); and *Allnutt v. United States*, 498 F.Supp. 832 (W.D.Mo.1980)—to the extent that they support the government's position at all (*Allnutt* does not), involved either typical discretionary activities or the enforcement of safety standards of the type discussed by the Supreme Court in *United States v. S.A. Empresa de Viacao Aerea Rio Grandese*, — U.S. —, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The Court's discussion in that case of its previous *Eastern Air Lines* decision appears to indicate that the discretionary function exception does not apply to the negligence of air traffic controllers and related acts of supervisors.

an air crash involving the U.S. Army in Vietnam, observing:

> ... officials acting at the Seat of the Government were the ultimately responsible actors in the chain of circumstances and specific events which ended in the deaths and injuries at issue here. Because of the national interests at stake here, the law of the forum, which is the law enacted by Congress for the Seat of the Government, should be displaced only if some other jurisdiction has an overwhelming policy interest in applying is own law (citations omitted).

The Court concludes that it is appropriate to apply District of Columbia. law to this controversy and to allow the suit to be brought here.[26]

## III

For the reasons stated, the motion to dismiss will be denied. However, it is obvious from what has been said that the order of dismissal involves at least one controlling question of law as to which there is substantial ground for difference of opinion. It also appears that an immediate appeal may materially advance the ultimate termination of the litigation. For these reasons, the Court will certify this case to the Court of Appeals for its consideration in conformity with 28 U.S.C. § 1292(b).

---

**26.** The Supreme Court said in *Burnette Machine Works, Ltd. v. Kockum Industries, Inc.,* 406 U.S. 706, 92 S.Ct. 1936, 32 L.Ed.2d 428 (1972) with respect to venue provisions regarding suits against aliens that

> Congress does not in general intend to create venue gaps, which take away with one hand

what Congress has given by way of jurisdictional grant with the other. Thus, in construing venue statutes, it is reasonable to prefer the construction that avoids leaving such a gap.

406 U.S. at 710 n. 8, 92 S.Ct. at 1939 n. 8.